COMMONWEALTH *vs.* KEVIN P. SULLIVAN.

Middlesex.    June 6, 1985. — September 23, 1985.

Present: PERRETTA, KASS, & WARNER, JJ.

*Homicide.   Reasonable Doubt.   Practice, Criminal,* Instructions to jury,
   Duplicitous convictions.   *Error,* Harmless.

At the trial of a murder case, a substantial risk of a miscarriage of justice
   resulted when the judge, in response to questions from the jury on the
   third day of the jury's deliberations, gave instructions on reasonable
   doubt including statements that in a civil case anything over fifty percent
   "might be a preponderance of the evidence," and that proof beyond a
   reasonable doubt was something more than that, something "above fifty
   percent," where, although the evidence that the defendant had killed the
   victim was overwhelming, there was also evidence on which the jury,
   if properly instructed, might have found the defendant guilty of man-
   slaughter rather than second degree murder. [804-807]
At a murder trial no substantial risk of a miscarriage of justice resulted from
   the judge's failure, in instructing the jury on malice aforethought, to
   state explicitly that knowledge of a strong likelihood that death would
   result was essential, where evidence that the defendant had plunged a
   knife almost eight inches into the victim's back left little for the jury to
   consider as far as likelihood of death or grievous injury was concerned.
   [808]
Evidence at a murder trial was sufficient to require an instruction on involun-
   tary manslaughter. [809]
At the trial of a murder case there was no error in the judge's instructions to
   the jury with respect to voluntary manslaughter. [809]
Convictions of second degree murder and assault and battery by means of a
   dangerous weapon, arising from the defendant's stabbing the victim in
   the hand and then fatally in the back, were duplicitous where the sequence
   of the blows was so close that the acts involved were so intertwined as
   to be one. [809-810]

INDICTMENTS found and returned in the Superior Court De-
partment on January 12 and 13, 1983.

The cases were tried before *John L. Murphy, Jr.,* J.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for the defendant.

*Margot Botsford,* Assistant District Attorney (*Patricia A. McEvoy,* Assistant District Attorney, with her) for the Commonwealth.

KASS, J. On the fourth day of deliberations, a jury returned verdicts of guilty against the defendant, Kevin P. Sullivan, of murder in the second degree, of assault and battery by means of a dangerous weapon upon John Grimes (who was killed) and upon Paul Kelly, and of assault and battery upon Deborah Sullivan, the defendant's wife. We reverse the convictions of murder and assault and battery by means of a dangerous weapon because a supplementary charge erroneously undertook to quantify the concept of reasonable doubt.[1]

Among the patrons who had been ushering in the new year, 1983, at the Stephen James House in Porter Square, Cambridge, were the victims and the defendant Sullivan. Their celebration had been characterized by ample drinking, particularly on the part of Sullivan. At about 1:45 A.M., Sullivan and his wife emerged from the restaurant arguing, Sullivan resorting to blows and shoves. Grimes and Kelly, who did not know the Sullivans, intervened in what they perceived as a wife-beating episode.[2] There was a fight. Sullivan pulled a knife with which he stabbed Grimes fatally and Kelly much less severely. At trial, Sullivan did not deny having stabbed Grimes and Kelly but claimed he acted in defense of himself and his wife. On appeal Sullivan urges: (1) several occasions of error in the judge's charge; and (2) that the concurrent sentences imposed for murder and assault and battery by means of a dangerous

---

[1] Although the defendant's brief did not expressly request relief from the conviction of assault and battery by means of a dangerous weapon on Paul Kelly, defense counsel has represented to the court by motion and argument that the failure to do so was inadvertent and that counsel intended no waiver of the defendant's appeal on that conviction. We are of opinion that the error which undermines the convictions of murder and assault and battery by means of a dangerous weapon on John Grimes must inevitably infect the conviction of assault and battery by means of a dangerous weapon on Paul Kelly. The conviction of assault and battery on Deborah Sullivan was placed on file with the defendant's consent. No appeal lies as to that indictment. *Commonwealth* v. *Delgado,* 367 Mass. 432, 438 (1975). *Commonwealth* v. *Flanagan,* 17 Mass. App. Ct. 366 (1984).

[2] Mrs. Sullivan, at trial, described it as a "lovers' quarrel."

weapon on Grimes constitute multiple punishment for the same act. An additional issue which the appellant argues need not, in view of our disposition of the case, detain us.

1. *Reasonable doubt.* During the main part of his charge the judge, in explaining the idea of reasonable doubt, wisely hewed to the text of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850). In so doing he followed the admonition in *Commonwealth* v. *Therrien,* 371 Mass. 203, 209 (1976), and *Commonwealth* v. *Ferreira,* 373 Mass. 116, 130 n.12 (1977). See also *Commonwealth* v. *Little,* 384 Mass. 262, 266-267 (1981). On the third day of deliberations the jury put several questions, one of which asked for reinstruction about reasonable doubt. Again the judge used the language from the *Webster* case. Among the other questions of the jury was one which asked for instruction on how to come to a verdict.

Perhaps a lecture about listening to one another, along the lines of *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 98-102 (1973), was in order. Rather, the judge undertook to assist the jury by discussing burden of proof, aspects of reasonable doubt, and comparisons with the burden of persuasion in civil cases. It was in the course of that discussion that things unraveled. "If you try to equate it by a scale in a civil case," the judge explained, ". . . anything over [fifty percent] might be a preponderance of the evidence. As I have defined a reasonable doubt, [there] is more or less a greater degree of proof[] required, so you don't have a reasonable doubt. Where is that if you put it in a one to hundred scale? I don't know. It's above fifty percent." Several lines in the transcript later the judge said: "In your own mind, if something is equal, then the Commonwealth has not proved it beyond a reasonable doubt. If, in your mind, using the reasonable doubt [standard] as the Court has given it to you, if in your mind they have proved it beyond a reasonable doubt, then that element of the crime has been proven."[3]

---

[3] The full text of the supplementary charge in question is as follows: "There was one other question that you have asked the Court: How to come to a verdict. Having never been on a jury, the Court doesn't know. That's a tough one; that's why a juror's job is a tough one. There is a solution, and this is why the law imposes the burden of proof on one party or another. In a criminal case, the burden of proof is always on the Commonwealth. In a civil case, the plaintiff may not always have the burden of proof; the defendant sometimes has the burden of proof. I won't go into that in detail,

No objection was made by defense counsel, and the point on appeal is lost unless the error is such as produces a substantial risk of miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). *Commonwealth* v. *Pickles,* 393 Mass. 775, 776 (1985). No part of the usual instructions to juries, however, is of more significance than the discussion of reasonable doubt, *Commonwealth* v. *Ferreira,* 373 Mass. at 128, and serious misdirection about reasonable doubt, therefore, can scarcely avoid creating a substantial risk of miscarriage of justice. Such, certainly, was the case here.

Although the Commonwealth's case was strong, the jurors were obviously having some difficulty in its resolution. The jurors were on the third day of deliberation when the instruction in question was given, and the jury had twice sent questions to the judge. There could be no doubt about the killing, but the jury had the self-defense and voluntary manslaughter possibilities to ponder. Given their state of indecision, it may surely have been influential for the jury to hear that "beyond

---

but take that as true. So the law places the burden of proof, and in this case, again, it's beyond a reasonable doubt. If you can't make up your mind, you don't know which way to go, then you've got to consider, has it been proved beyond a reasonable doubt. In a civil case, if you're equally balanced, as they talk about the scales being equally balanced — Suppose I'm representing someone who was hit by a Checker Cab. The jury just has to find by a preponderance of the evidence. If you try to equate it by a scale in a civil case, preponderance of the evidence is just a little more than, say, fifty percent, fifty one percent, ninety percent; anything over that might be a preponderance of the evidence. As I have defined a reasonable doubt, that is more or less a greater degree of proof is required, so that you don't have a reasonable doubt. Where is that if you put it in a one to hundred scale? I don't know. It's above fifty percent. Everybody here, if you could pick your brain apart and see, based upon your background, your training, your judgment, what is a reasonable doubt. I dare say it really differs a little bit in everybody, but this is how the law tells you to come to a verdict. If you can't make up your mind, then the Commonwealth has not established beyond a reasonable doubt that element of the crime. And that, you may say, is a safety valve. In your own mind, if something is equal, then the Commonwealth has not proved it beyond a reasonable doubt. If, in your mind, using the reasonable doubt as the Court has given it to you, if in your mind they have proved it beyond a reasonable doubt, then that element of the crime has been proven. And beyond that the Court will say nothing. Good luck."

a reasonable doubt" was something "above fifty percent" and that the Commonwealth would have failed of its burden if, in the minds of the jurors, the facts on an element of an offense lay equal.

The idea of reasonable doubt is not susceptible to quantification; it is inherently qualitative. See, e.g., *United States* v. *Anglada,* 524 F.2d 296, 300 (2d Cir. 1975); *People* v. *Collins,* 68 Cal. 2d 319, 330-332 (1968); *People* v. *Harbold,* 124 Ill. App. 3d 363, 383 (1984); *State* v. *Boyd,* 331 N.W. 2d 480, 482-483 (Minn. 1983); *McCullough* v. *State,* 99 Nev. 72, 75 (1983); Nesson, Reasonable Doubt and Permissive Inferences: The Value of Complexity, 92 Harv.L.Rev. 1187, 1196-1199 (1979). The Supreme Court has described the finding of guilt beyond a reasonable doubt as requiring a subjective state of near certitude. *Jackson* v. *Virginia,* 443 U.S. 307, 315 (1979). Attempts to express the idea in terms of a scale can easily confuse the jury about the burden the prosecution must sustain and may have the effect of lowering that burden. *McCullough* v. *State, supra* at 75-76.[4] *State* v. *Smith,* 183 Conn. 17, 24-29 (1981).[5] Compare *Petrocelli* v. *State,* 692 P.2d 503, 506-507 (Nev. 1985).

Of course flaws in a jury charge must be viewed in the context of the over-all charge. *Commonwealth* v. *Beverly,* 389 Mass. 866, 870-871 (1983). Compare *Commonwealth* v. *Gerald,* 356 Mass. 386, 389-390 (1969), in which the judge's supplement to the *Webster* charge was consistent and nonpreju-

---

[4] Nevada defines the idea of reasonable doubt by statute and provides: "No other definition of reasonable doubt shall be given by the court to juries in criminal actions in this state." Nev. Rev. St. 175.211(2) (1981). As the *McCullough* case illustrates, it is one thing to state a rule of judicial abnegation, and another thing to make it stick. Compare *People* v. *Garcia,* 54 Cal. App. 3d 61 (1975), cert. denied, 426 U.S. 911 (1976), and cases cited.

[5] In the *Smith* case the judge said: "I am sorry that I cannot give you a graphic or pictorial description as to what is required for the State to prove their case beyond a reasonable doubt by indicating on the scale whether it would be an inch or a foot or a yard or a mile. I can't do that, so please bear in mind that if the evidence is in equipoise or equal, the State has not sustained its burden . . . . For the State to prevail, you must find the scales tipped beyond a reasonable doubt."

dicial. In that vein one might reason that the judge's supplementary charge did not embrace a quantitative measure of doubt but, rather, set that standard up as a contrast to the correct *Webster* definition he had twice given and which he was incorporating by reference. While it is possible the jury so understood the supplementary charge, it is much more likely that they understood it as explication. At the least we do not know what the jurors understood. See *Commonwealth* v. *Wood,* 380 Mass. 545, 548 (1980), a case in which the charge might have led the jury to believe the "degree of certainty required to convict was far lower than that properly demanded in a criminal case." *Ibid.*

Much depends on the "end game" timing of the supplementary charge. While the next day's deliberations brought further questions about definitions of the crimes and still further additional instruction, the supplementary instruction we have been discussing was among the last impressions left on the minds of the jurors. We cannot expect the jury to have disregarded a literal and graphic rule of thumb as to how to arrive at a decision and to have intuitively understood that it was an erroneous elaboration upon the reasonable doubt standard that had been presented as a self-contained instruction at an earlier point in the answers to their questions. *Commonwealth* v. *Pickles,* 393 Mass. at 778-779. *United States* v. *Link,* 202 F.2d 592, 594 (3d Cir. 1953). Contrast *Commonwealth* v. *Beverly,* 389 Mass. at 871-872; *United States* v. *Baratta,* 397 F.2d 215, 227 (2d Cir.), cert. denied, 393 U.S. 939 (1968). Compare *Commonwealth* v. *Sheline,* 391 Mass. 279, 291-297 & n.4 (1984).

To the extent it requires mention, we do not think, reading the words fairly and in context, that the judge by employing the phrase "we're playing games with words" or referring to the ingredients of a cake either trivialized or distorted the Commonwealth's burden to prove each element of the crimes charged. Particularly the references to playing games, however, would far better have been left unsaid.

We discuss — briefly — other points which might recur at a new trial. Three involve the jury instructions, and a fourth bears on duplicitous sentences.

2. *Definition of malice aforethought.* In instructing on the elements of murder, the judge defined malice aforethought. On appeal, no objection having been made below, the defendant attacks the instruction as incomplete in the following regard: it did not include the idea of knowledge by the defendant (or by a reasonably prudent person in the circumstances known to the defendant) that there was a strong likelihood that death would follow the contemplated act. Such is certainly an element of a complete charge on malice aforethought. See *Commonwealth* v. *Starling,* 382 Mass. 423, 427-428 (1981); *Commonwealth* v. *Griffin,* 19 Mass. App. Ct. 174, 189 (1985). Its omission here was far from a defect creating a substantial risk of miscarriage of justice. *Commonwealth* v. *Bent,* 19 Mass. App. Ct. 950 (1985). As in *Bent,* the nature of the assault left little for the jury to brood about so far as likelihood of death or grievous injury was concerned. The knife was plunged almost eight inches into the victim's back. The charge, as delivered, conformed to *Commonwealth* v. *Casale,* 381 Mass. 167, 171-172 (1980). It also was implicit in portions of the charge that one who had malice aforethought had an awareness that death or grievous injury would follow. Cf. *Commonwealth* v. *Estremera,* 383 Mass. 382, 394-396 (1981).

3. *Involuntary manslaughter.* There was neither a request by the defendant for a charge on involuntary manslaughter nor any objection to the failure of the judge to give such a charge. As in *Commonwealth* v. *A Juvenile,* 17 Mass. App. Ct. 988, 990 (1984), we need not consider whether the failure so to do was error because we are reversing the murder judgment. It is reversible error "if, in a murder prosecution, the jury would be warranted in finding the defendant guilty of manslaughter, rather than murder," not to give an instruction on involuntary manslaughter where one is requested. *Commonwealth* v. *Martinez,* 393 Mass. 612, 613 (1985). "'Involuntary manslaughter is an unlawful homicide unintentionally caused by . . . wanton or reckless conduct'. . . . '[W]anton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.'"

*Commonwealth* v. *Michaud,* 389 Mass. 491, 495-496 (1983). The defendant had testified that he had waved his knife in defense, not meaning to strike a fatal blow. There was evidence to support the theory of involuntary manslaughter, and it would have been wise to charge about it. Cf. *Commonwealth* v. *Alfonso,* 19 Mass. App. Ct. 599, 604-605 (1985).

4. *The voluntary manslaughter charge.* Voluntary manslaughter is "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Walden,* 380 Mass. 724, 727 (1980). The judge did not mention "sudden combat" in so many words in his original charge. No objection was taken. We think the judge's original charge, by referring to a response by a person assailed with great violence, adequately conveyed the idea of killing upon sudden combat. He did refer to sudden combat in supplementary instructions. There was no error and certainly no substantial risk that the jury were deprived of considering a voluntary manslaughter alternative.

5. *Duplicitous convictions.* The defendant argues that the second degree murder of Grimes here incorporated all the elements of assault upon Grimes by means of a dangerous weapon, that the convictions are duplicitous, and that the judgment as to the latter crime ought to be vacated. As we are reversing these convictions, we touch on the issue only insofar as it may arise in a new trial. The question is whether each crime requires proof of an additional fact that the other does not. *Morey* v. *Commonwealth,* 108 Mass. 433, 434 (1871). *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306-307 (1972). *Commonwealth* v. *Jones,* 382 Mass. 387, 393 (1981). There was a knife blow by Sullivan to the hand of Grimes which was not the fatal blow. We think, however, that the sequence of the blows was so close that as a matter of fact and sense the acts involved were so intertwined as to be one. See *Costarelli* v. *Commonwealth,* 374 Mass. 677, 683-684 (1978); *Commonwealth* v. *St. Pierre,* 377 Mass. 650, 662-663 (1979). Contrast the series of temporally distinct acts in *Commonwealth* v. *Griffin,* 19 Mass. App. Ct. at 190. Neither the lawyers' presentations nor

the judge's charge suggested separating the hand stabbing from the back stabbing. See *Commonwealth* v. *Wilson,* 381 Mass. 90, 124-125 (1980).

The judgments on indictment nos. 83-0043, 83-0044, and 83-0047 are reversed, and the verdicts on those indictments are set aside.

*So ordered.*